IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| STYME ENGRAM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 1:12-cv-388-MHT |
| | ) | (WO) |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## RECOMMENDATION OF THE MAGISTRATE JUDGE

## I. Introduction

On August 7, 2008 the plaintiff, Styme[2] Engram filed a Title II application for a period of disability and disability benefits. (R.110-19). Engram alleges disability beginning July 28, 2008. (R. 112). After the claims were initially denied, Engram requested and, on March 8, 2010, received a hearing before an administrative law judge ("ALJ"). (R. 26). Following the hearing, ALJ Linda J. Helm denied the claim on April 1, 2010. (R. 20). On March 1, 2012, the Appeals Council rejected a subsequent request for review. (R. 1). The ALJ's decision consequently became the final decision of the Commissioner of Social Security ("Commissioner").[3] *See Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). The

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.

[2] In the record, Mr. Engram's first name is alternately spelled "Stime" (R. 12, 156), "Styme" (R. 69, 167), and "Stine" (R. 184). At the administrative hearing in this case, Engram explained that both "Styme" and "Stime" are correct spellings, but, on his birth certificate, his first name is spelled "Styme." (R. 32).

[3] Pursuant to the Social Security Independence and Program Improvements Act of 1994, Pub. L. No. 103-296, 108 Stat. 1464, the functions of the Secretary of Health and Human Services with respect to Social

case is now before the court for review pursuant to 42 U.S.C. §§ 405 (g) and 1383(c)(3). The court concludes that the Commissioner's decision be affirmed.

## II.  Standard of Review

Under 42 U.S.C. § 423(d)(1)(A) a person is entitled to disability benefits when the person is unable to

> engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . .

To make this determination[4] the Commissioner employs a five-step, sequential evaluation process. *See* 20 C.F.R. §§ 404.1520, 416.920.

> (1)  Is the claimant presently unemployed?
> (2)  Is the claimant's impairment severe?
> (3)  Does the claimant's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
> (4)  Is the claimant unable to perform his or her former occupation?
> (5)  Is the claimant unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).[5]

_____

Security matters were transferred to the Commissioner of Social Security.

[4] A "physical or mental impairment" is one resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 20 C.F.R.  § 404.1508.

[5] *McDaniel v. Bowen,* 800 F.2d 1026 (11th Cir. 1986) is a supplemental security income case (SSI). The same sequence applies to disability insurance benefits. *See Sullivan v. Zebley*, 493 U.S. 521, 525 n.3

The standard of review of the Commissioner's decision is a limited one.  This court must find the Commissioner's decision conclusive if it is supported by substantial evidence. *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); 42 U.S.C. § 405(g).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  A reviewing court may not look only to those parts of the record which supports the decision of the ALJ, but instead must view the record in its entirety and take account of evidence which detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179 (11th Cir. 1986).

> [The court must] . . . scrutinize the record in its entirety to determine the reasonableness of the [Commissioner's] . . . factual findings . . . No similar presumption of validity attaches to the [Commissioner's] . . . legal conclusions, including determination of the proper standards to be applied in evaluating claims.

*Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

### III.  The Issues

**A.  Introduction.**  Engram was born on November 9, 1965.  (R. 112).   He was 44 years old on the date the ALJ issued an opinion in this case.  (R. 20, 112).  He completed high school, but does not have a high school diploma or GED. (R. 36).  Engram's past employment history includes work as a construction laborer, delivery driver, lead shift worker at a restaurant, and cook.  (R. 55).  Engram alleges that he is disabled due to

---

(1990). Cases arising under Title II are appropriately cited as authority in Title XVI cases. *See, e.g., Sullivan*, 493 U.S. at 525 n.3; *Ware v. Schweiker*, 651 F.2d 408 (5th Cir. 1981) (Unit A).

hypertension, chest pain, hiatal hernia, headaches, muscle aches and pains, and knee pain. (R. 14, 48, 50).

**B.    The Findings of the ALJ**

The ALJ found that Engram's hypertension was a severe impairment.  (R. 14).  The ALJ also found that, taken together, Engram's hiatal hernia, headaches, and muscle aches and pains comprised a "severe combination of impairments."  (R. 14).

The ALJ concluded that Engram does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 14).

The ALJ determined that Engram

> has the residual functional capacity to perform less than the full range of medium work as defined in 20 C.F.R. 404.1567(c).  Specifically, the claimant can perform overhead reaching occasionally.  He cannot climb ladders, scaffolds, or ropes.  He cannot work around unprotected heights or dangerous equipment.

(R. 15).

The ALJ found that Engram "is capable of performing past relevant work as a lead shift worker."  (R. 19).  Therefore, the ALJ concluded that Engram is not disabled.  (R. 20).

**C.    Issues.**

Engram presents the following issues for review:

1.    Whether substantial evidence supports the ALJ's decision to assign little weight to the November 18, 2009, residual functional capacity questionnaire completed by Engram's treating physician on grounds that the physician's responses were conclusory and addressed issues

4

reserved to the Commissioner;

2.      Whether the ALJ erred as a matter of law by not recontacting Engram's treating physician to resolve inconsistencies between the treating physician's opinion and the record as a whole;

3.      Whether the ALJ erred as a matter of law in discrediting the opinion of the treating physician on grounds that he was not a specialist;

4.      Whether the ALJ erred in considering Engram's activities of daily living in assessing the credibility of Engram's subjective testimony;

5.      Whether the ALJ erred in failing to consider Engram's alleged educational deficits;

6.      Whether substantial evidence supports the ALJ's determination of Engram's residual functional capacity; and

7.      Whether the ALJ erred in considering the frequency and type of medications that Engram took to treat his alleged pain symptoms.

(Doc. 13 pp. 1-2, 6).

## IV.  Discussion

**A.      Substantial evidence supports the ALJ's decision to assign little weight to the November 18, 2009, residual functional capacity questionnaire completed by Engram's treating physician.**

On November 18, 2009, Engram's treating primary care provider, Dr. David H. Arnold, completed a physical residual functional capacity questionnaire in which he stated that Engram suffered from hypertension and gastrointestinal reflux disease ("GERD").  (R. 242).  Dr. Arnold opined that Engram's pain and other symptoms would be severe enough to occasionally interfere with the attention and concentration needed to perform even simple work tasks.  (R. 243).  Dr. Arnold stated that, due to Engram's impairments, Engram could

5

walk only three to four blocks without rest or severe pain; he could sit more than two and one-half hours before needed to get up; and he could stand more than two hours before needing to sit down (however, Dr. Arnold also wrote "not sure" beside his answer to the question about the length of time Engram could stand). (R. 243-44). Dr. Arnold stated that, in an eight hour day with normal breaks, Engram could stand/walk for a total of two hours and he could sit for a total of two hours. (R. 244). Dr. Arnold stated that Engram needed a job that would permit him to shift positions at will, and he needed to take unscheduled breaks every two hours. (R. 244). Dr. Arnold stated that Engram could rarely lift loads weighing less than ten pounds, ten pounds, twenty pounds, and fifty pounds. (R. 244). According to Dr. Arnold, Engram could frequently twist, but only rarely stoop, bend, crouch, squat, or climb ladders and stairs. (R. 245). Dr. Arnold stated that, for one hundred percent of an eight hour workday, Engram could use his hands to grasp, turn, and twist objects, his fingers for fine manipulation, and his arms for reaching overhead. (R. 245). Dr. Arnold also advised that Engram would need to avoid extremes in heat and humidity and avoid prolonged work hours (R. 245). In Dr. Arnold's estimation, due to hypertension and GERD, Engram was likely to be absent from work more than four days per month. (R. 245).

The ALJ assigned little weight to Dr. Arnold's residual functional capacity questionnaire responses. Engram argues that, because Dr. Arnold was his treating physician, the ALJ erred as a matter of law in not assigning controlling weight to Dr. Arnold's questionnaire responses. However, the opinion of a treating physician "must be given

substantial or considerable weight *unless 'good cause' is shown to the contrary*." *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997) (emphasis added). An ALJ is entitled to disregard the opinion of a treating physician when the record substantially supports the conclusion that "the (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004). Thus, to the extent that Dr. Arnold's responses to the residual functional capacity questionnaire qualify as a medical opinion, the ALJ was obliged to give substantial weight to that opinion unless the ALJ provided clearly-articulated reasons for finding "good cause" to disregard it. *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004). Moreover, to the extent that Dr. Arnold's responses constitute opinions on certain issues that are reserved to the Commissioner, such as the claimant's residual functional capacity, his responses are not "medical opinions . . . because they are administrative findings that are dispositive of a case; *i.e.*, that would direct the determination or decision of disability." 20 C.F.R. § 404.1527(d)(2)-(3). The ALJ must consider medical source opinions on such issues, but the ALJ is not required to give "any special weight" to a medical source opinion "on issues reserved to the Commissioner." *Id*.

In this case, after reviewing the medical record and the evidence as a whole, the ALJ considered Dr. Arnold's responses to the residual functional capacity questionnaire and assigned them little weight, explaining:

The record reflects significant gaps in the claimant's history of treatment. In 2008, the claimant had three office visits prior to his alleged onset date: on March 25, 2008, for sinus problems; April 1, 2008, for right ear pain; April 2, 2008, to review the results of his lab work.[6] The claimant also had four office visits after his alleged onset date: on July 31, 2008, for his chest and muscle pains; August 1, 2008, to complete radiologic testing; August 4, 2008, to review the radiological scans; and August 15, 2008, for a routine medication review and to treat his chest pain. (Exhibit 2F). There is no evidence the claimant subsequently sought treatment for approximately one year, until July 15, 2009. The claimant did not seek further treatment for four months. His next office visit was November 18, 2009. (Exhibit 4F). At the hearing, the claimant testified he saw Dr. Arnold the week before the hearing to treat a sinus infection. Thus, the relative infrequency of the claimant's treatment did not change on or around his alleged disability onset date, which casts some doubt on the degree of pain he was experiencing during this time period.

Although the claimant has received treatment for the allegedly disabling impairments, that treatment has been essentially routine and/or conservative in nature. The claimant never sought or received treatment from a specialist; all treatment has been rendered by Dr. Arnold, who practices family medicine. The claimant's treatment has been primarily limited to medications, although he testified he is also on a heart healthy diet. (Exhibits 2F and 4F).

. . . .

On November 18, 2009, Dr. Arnold completed a "Physical Residual Functional Questionnaire." The opinion expressed is quite conclusory, providing very little explanation of the evidence relied on in forming that opinion. Dr. Arnold failed to report any clinical findings or objective signs which supported his opinion. When prompted to "Identify the clinical findings and objective signs," Dr. Arnold provided no response. (Exhibit 5F). The doctor's own reports fail to reveal the type of significant clinical and laboratory abnormalities one would expect if the claimant were in fact disabled, and the doctor did not specifically address this weakness. (Exhibits 2F, 4F and 6F).

---

[6][According to Dr. Arnold, "[t]he results of the recent [April 2008] lab (blood) studies are reviewed and felt to be normal. Any values that are mildly out of the normal range are not felt to be significant and are not suggestive of any medical or health problem." (R. 219). Dr. Arnold noted the test results indicated "Mild elevation of cholesterol and triglycerides[. D]iet and exercise will help. [R]epeat in 3 months." (R. 219).]

Therefore, Dr. Arnold's opinion on the claimant's functional limitations appears to be based solely on the claimant's symptoms. Dr. Arnold reported the claimant had been diagnosed with hypertension and gastroesophageal reflux disease. He stated the claimant experienced intermittent chest pain and multiple joint symptoms. Dr. Arnold apparently addressed the claimant's symptoms and pain in further detail in a note, which is not present in the record. (Exhibit 5F).

. . . .

Dr. Arnold's report appears to contain inconsistencies, and the doctor's opinion is accordingly rendered less persuasive. Dr. Arnold estimated the claimant could sit for at least 2 and 1/2 hours at one time and stand over two hours at one time; however, he opined the claimant could sit or stand/walk about 2 hours total in an 8-hour working day. In contrast to his conflicting opinions that the claimant could sit for 2 1/2 hours at one time or about 2 hours total in one day, Dr. Arnold opined the claimant would need to walk for fifteen minutes every hour. (Exhibit 5F).

Dr. Arnold's opinion is inconsistent with his treatment records. Dr. Arnold predicted the claimant would likely be absent from work as a result of his impairments or treatment more than four days a month. Although the doctor does have a treating relationship with the claimant, the record reveals that actual treatment visits have been relatively infrequent, as discussed above. In addition, the course of treatment pursued by Dr. Arnold has not been consistent with what one would expect if the claimant were truly disabled, as he has reported. Given Dr. Arnold's estimation of the claimant's functional limitations, one might expect to see some indication in the treatment records that Dr. Arnold placed restrictions on the claimant. Yet a review of the record in this case does not reveal any restrictions recommended by him. As noted above, Dr. Arnold's course of treatment has been essentially routine and/or conservative in nature. For the reasons described above, Dr. Arnold's opinion has been accorded little weight.

(R. 16, 18-19).

Engram argues that the ALJ should not have disregarded Dr. Arnold's opinion based on the frequency and type of treatment Dr. Arnold rendered the claimant.  (Doc. 13 p. 5).

9

However, the ALJ applied the correct legal standard in evaluating Dr. Arnold's questionnaire responses in light of the frequency and type of treatment he provided. "Generally, the longer a treating source has treated [a claimant] *and the more times [the claimant has] been seen by a treating source*, the more weight [the Commissioner] will give to the source's medical opinion." 20 C.F.R. 404.1527(c)(2)(i) (emphasis added). Engram argues that he did see Dr. Arnold "frequently" and Dr. Arnold "provided necessary treatment." (Doc. 11 p. 5). Engram's brief, conclusory argument on this point is premised on no more than his own personal disagreement with the use of the word "infrequent" to describe his medical visits to Dr. Arnold. (Doc. 11 p. 5). Engram has not cited any legal authority or evidence to contradict the ALJ's substantive findings as to the dates and nature of the treatment Engram received from Dr. Arnold.

Having reviewed the evidence cited by the ALJ, and the record as a whole, the court concludes that the adequately developed record substantially supports the ALJ's stated reasons for assigning little weight to Dr. Arnold's November 18, 2009 questionnaire responses, including the ALJ's characterization of the frequency and level of medical treatment provided by Dr. Arnold. *See Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997) (holding that a reviewing court must find the Commissioner's decision conclusive if it is supported by substantial evidence).

**2.    The ALJ was not required to recontact Engram's treating physician to resolve inconsistencies in the treating physician's opinion.**

Engram argues that the ALJ erred as a matter of law because she "noted certain

10

discrepancies in" Dr. Arnold's November 18, 2009, residual functional capacity questionnaire responses, but "made no contact with [Dr. Arnold] to explain or rectify these alleged discrepancies." (Doc. 13 p. 7). In support of this argument, Engram relies on *Johnson v. Barnhardt*, 138 Fed. Appx. 266 (11th Cir. 2005), an unpublished panel decision in which the court stated:

> In making disability determinations, the Commissioner considers whether the evidence is consistent and sufficient to make a determination. If it is not consistent, the Commissioner weighs the evidence to reach her decision. If, after weighing the evidence, the Commissioner cannot reach a determination, then she will seek additional information or recontact the physicians.

138 Fed. Appx. at 270 (citing 20 C.F.R. § 404.1512(e) (repealed eff. March 26, 2012, 77 F.R. 10655, 10656)); *see also* 20 C.F.R. § 404.1520b(c) (eff. March 26, 2012, see 77 F.R. 10651-01) (providing that, where a disability determination cannot be reached due to an inconsistency in an underdeveloped administrative record, the Commissioner has the discretion to determine how to resolve such an inconsistency and "may" choose to do so by recontacting a treating physician).

Under *Johnson*, an ALJ is only required to "seek additional information or recontact" the treating physician if, "after weighing the evidence, the Commissioner cannot reach a determination" because the evidence contains unresolvable conflicts or inconsistencies due to an underdeveloped record. *Johnson*, 138 Fed. Appx. at 270; *see also* 20 C.F.R. § 404.1520b(c); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997) ("[T]he ALJ has a basic obligation to develop a full and fair record."). *But see* 20 C.F.R. § 404.1520b(c) (eff.

11

March 26, 2012, see 77 F.R. 10651-01) (providing that the Commissioner "may" choose to resolve an inconsistency by recontacting a treating physician). When, as here, the record is already sufficiently developed for the ALJ to resolve conflicting or inconsistent evidence, the ALJ is entitled to weigh the evidence "and reach [a] decision." *Johnson*, 138 Fed. Appx. at 270; 20 C.F.R. § 404.1520b. Thus, where the record is adequately developed to substantially support a credibility determination with respect to a medical opinion that is conclusory or inconsistent with the record, an ALJ is not required to recontact the treating physician; rather, the ALJ is entitled to assign little weight to the opinion of a treating physician when the record substantially supports the conclusion that "the . . . treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004).

Engram has not identified inconsistency in Dr. Arnold's opinion that could not be resolved on the record before the ALJ. The court has reviewed the evidence cited by the ALJ, and the record as a whole, and concludes that the adequately developed record substantially supports the ALJ's explicitly stated reasons for finding that Dr. Arnold's November 18, 2009, residual functional capacity questionnaire responses were entitled to little weight because those responses were conclusory and inconsistent with Dr. Arnold's own medical records. *See Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005) ("[C]redibility determinations are the province of the [Commissioner]."); s*ee also Carson v. Comm'r of Soc. Sec. Admin.*, 300 Fed. Appx. 741, 743, (11th Cir. 2008) ("Where the ALJ

12

articulated specific reasons for failing to give the opinion of a treating physician controlling weight, and those reasons are supported by substantial evidence, we do not disturb the ALJ's refusal to give the opinion controlling weight.").

3.   **The ALJ did not erred as a matter of law in discrediting the opinion of the treating physician on grounds that he was not a specialist.**

Engram argues that the ALJ improperly discredited Dr. Arnold's opinion because he was not a specialist. (Doc. 13 p. 7). However, the ALJ did not discredit Dr. Arnold's opinion on grounds that he was not a specialist. (R. 16). Rather, the ALJ discredited *Engram's* subjective testimony about the extent and limiting effects of his symptoms because Engram never sought or received treatment from a specialist, and the treatment he did seek was only "relatively infrequen[t]," "routine," and "conservative treatment" provided by Dr. Arnold, who was his primary care provider. (R. 16). In evaluating the extent to which pain and other symptoms affect a claimant's ability to do basic work activities, the ALJ is entitled to consider a number of factors, including the type and frequency of medication and other medical treatment that the claimant receives, as well as the medical evidence as a whole. 20 C.F.R. § 404.1529(c)(3). Therefore, the ALJ did not err as a matter of law in considering these factors when evaluating the credibility of Engram's subjective testimony.

4.   **The ALJ did not err in considering Engram's activities of daily living in assessing the credibility of Engram's subjective testimony**.

In evaluating the credibility of Engram's hearing testimony, the ALJ noted:

At the hearing, the claimant testified that stress from working causes his heart to swell, which in turn causes pain in his chest and neck. He estimated he can

lift a gallon of milk but stated he cannot carry it too long because the weight pulls on his chest. He stated that he cannot walk even a block and estimated he could walk for a total of 30 minutes in an 8-hour workday. He reported he can stand in one place for up to 30 minutes. He reported that, when he takes Tramadol to treat his worst pain, it makes him sleepy and tired. He also testified that the medication which slows his heart rate also makes him tired.

The claimant has described daily activities which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. Although he testified he never lifts his three year old son, who weighs approximately 50 pounds, the claimant admitted that he cares for his son each day. He did not describe any particular assistance in caring for his son at home, which can be quite demanding both physically and emotionally. He testified he is able to help his wife with household shopping. He can place dishes in the dishwasher. The claimant acknowledged he had no problems driving and testified that he drove to the hearing, a distance of about 26 miles.

The claimant has made inconsistent statements, which undermine his credibility. At the hearing, the claimant testified he had not looked for employment since he last worked in July 2008. He stated that lifting caused his chest to hurt and his doctor advised him not do perform any lifting. However in a written statement dated August 28, 2008, the claimant reported "I am trying to find a job, been putting applications and resume out." (Exhibit 6E). In addition on November 18, 2009, the claimant's primary care provider, David H. Arnold, M.D. noted the claimant "tried to work last month." (Exhibit 4F). The claimant testified he does not attend school events. However in his written statement, the claimant stated that he volunteered with his son's football team. Throughout the football season, he coached during three weekly practices and games on Saturdays. (Exhibit 6E).

(R. 16).

Engram argues that the ALJ erred as a matter of law in considering his daily living activities in evaluating the credibility of his testimony.  He contends that his "activities in coaching pee-wee football or performing a few activities of daily living do not mean that he is not disabled, merely that he is not bed-ridden."  (Doc. 13 p. 5).  Engram contends that his

participation in these activities does not demonstrate that he can perform sustained activities in an ordinary work setting on a regular and continuing basis. *See* 20 C.F.R. 1545(b) ("When we assess your physical abilities, we first assess the nature and extent of your physical limitations and then determine your residual functional capacity for work activity on a regular and continuing basis."). In support of this argument, Engram cites *Lewis v. Callahan*, 125 F.3d 1436 (11th Cir. 1997), in which the Eleventh Circuit found that the ALJ improperly discredited the opinion of a treating physician without good cause by relying on the results of a six minute exercise test and on the claimant's "admission . . . that he participates in certain activities, such as housework and fishing." *Id.* at 1441. The Eleventh Circuit rejected the notion that "participation in everyday activities of short duration, such as housework or fishing, disqualifies a claimant from disability." *Id.* at 1441.

Contrary to Engram's characterization of the ALJ's opinion, the ALJ did *not* find that Engram's activities in coaching pee-wee football or performing a few activities of daily living *per se* demonstrated an ability to perform sustained activities in an ordinary work setting on a regular and continuing basis. Rather, the ALJ found that Engram's admitted participation in these activities was inconsistent with, and undermined, his subjective testimony about the limiting effects of his pain.

The ALJ did not err as a matter of law in considering whether Engram's activities of daily living undermined the credibility of his subjective testimony. Although participation in everyday activities of short duration does not *per se* disqualify a claimant from disability

15

in all cases, "[t]he regulations do not . . . prevent the ALJ from considering daily activities at the fourth step of the sequential evaluation process." *Macia v. Bowen*, 829 F.2d 1009, 1012 (11th Cir. 1987). Social Security regulations expressly provide that daily activities *should* be considered in evaluating "the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(a); 20 C.F.R. § 404.1529(c)(3)(i) (listing "daily activities" among the factors the Social Security Administration will consider in evaluating the limiting effects of a claimant's pain).

Further, the ALJ's stated reasons for her findings as to Engram's credibility are substantially supported by the record. *Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995) ("A clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court.").

**5.     The ALJ did not err in failing to consider Engram's alleged educational deficits.**

Engram repeated seventh grade twice, was in special education classes in high school and was awarded a certificate of completion rather than a high school diploma. (R.36, 184-86). He does not have a GED. Engram argues that the ALJ failed to take his educational background into consideration in determining his ability to perform basic work activities. In support of this argument, Engram cites *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997), in which the Eleventh Circuit held that, "along with his age, education and work experience, the claimant's residual functional capacity is considered in determining whether

16

the claimant can work."

Lewis is distinguishable.  In Lewis, the Eleventh Circuit considered whether the ALJ erred at step five of the sequential evaluation process by finding that the claimant "could do stress-free sedentary work of a kind that exists in sufficient number in the economy."  Id.[7] In this case, the ALJ determined, at step four of the sequential evaluation process, that Engram could return to his past work as a lead shift worker as he actually performed the job, and as that job is generally performed in the national economy.  (R. 20).  Vocational factors such as education must be considered at step five, not at step four.  20 C.F.R. § 404.1520(f) (providing that a claimant's ability to perform past relevant work is determined by comparing the claimant's residual functional capacity with the physical and mental demands of the plaintiff's past relevant work); 20 C.F.R. § 404.1520(g) (If we find that you cannot do your past relevant work . . . we will consider the . . . residual functional capacity assessment . . . together with your vocational factors (your age, education, and work experience) to determine if you can make an adjustment to other work." (emphasis added)); 20 C.F.R. 404.1560(b)(3) ("If we find that you have the residual functional capacity to do your past relevant work, we will determine that you can still do your past work and are not disabled. We will not consider your vocational factors of age, education, and work experience or whether your past relevant work exists in significant numbers in the national economy.");

_____

[7]Moreover, the holding in Lewis had nothing to do with the claimant's educational background.  In Lewis, the court was "concerned . . . with [whether] the doctors' evaluations of [the claimant's] condition" supported the ALJ's finding at step five.  Lewis, 125 F.3d at 1440 ("Our focus is on the objective medical findings made by each doctor and their analysis based on those medical findings.").

*Barnhart v. Thomas*, 540 U.S. 20, 25 (2003) ("[A]t [step four of the sequential evaluation process,] the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled.  If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called 'vocational factors' (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. . . . [S]tep four can result in a determination of no disability without inquiry into whether the claimant's previous work exists in the national economy." (footnote omitted)); *Heckler v. Campbell*, 461 U.S. 458, 461 (1983) ("If a claimant can pursue his former occupation, he is not entitled to disability benefits.  If he cannot, the Secretary must determine whether the claimant retains the capacity to pursue less demanding work.  The regulations divide this last inquiry into two stages. First, the Secretary must assess each claimant's present job qualifications. The regulations direct the Secretary to consider the factors Congress has identified as relevant: physical ability, age, education and work experience. Second, she must consider whether jobs exist in the national economy that a person having the claimant's qualifications could perform." (citations and footnote omitted)).

Because the ALJ's disability determination rested on her finding that Engram could return to past relevant work that he has previously performed despite his alleged educational deficit, and not on a finding that Engram could perform other available jobs in the economy, the ALJ was not required to consider Engram's educational background as a vocational

factor.  20 C.F.R. 404.1560(b)(3).  Thus, the ALJ followed the proper legal standard in determining, at step four, that Engram was not disabled because he could return to his past relevant work.  *Id.* (providing that vocational factors such as education will not be considered in determining that claimant "can still do [his] past work and [is] not disabled").

Engram also argues that his academic history provides evidence of a mental impairment.  "A . . . mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings."  20 CFR § 404.1508.  Poor academic performance, without more, is not sufficient evidence to establish the existence of a mental impairment.  20 C.F.R. 404.1513 ("We need evidence from acceptable medical sources to establish whether you have a medically determinable impairment(s).").

**6.    Substantial evidence supports the ALJ's determination of Engram's residual functional capacity.**

As the ALJ noted in her opinion, "an echocardiogram performed on August 1, 2008, showed eccentric left ventricular hypertrophy with thickening of the interventricular septum but was otherwise unremarkable."  (R. 17, 249).  Dr. Arnold noted that the August, 2008, "heart scan shows mild thickening of the muscle, related to hypertension."  (R. 218).  Dr. Arnold recommended that "it would be important for [Engram] to check [his] blood pressure regularly at home and [at Dr. Arnold's office] to make sure the readings stay normal[.] [W]e may need to increase the medications if they are even slightly up."  (R. 218).

Engram argues that the ALJ erred in failing to consider his left ventricular hypertrophy to be a "serious condition" or account for its symptoms in determining his

19

residual functional capacity. Engram suggests that he suffers serious complications from his left ventricular hypertrophy, but he does not cite objective medical evidence of such complications in the record. Instead, he cites an internet article (http://www.mayoclinic.com/health/left-ventricular-hypertrophy/ds00680) listing the potentially serious complications "that can occur" in patients with left ventricular hypertrophy, such as heart failure, arrythmia, ischemic heart disease, heart attack, and sudden cardiac arrest.

Although the ALJ found hypertension to be a severe impairment, the ALJ did not find left ventricular hypertrophy (related to hypertension) to be a severe impairment. To the extent that Engram is attempting to argue that the ALJ erred in failing to list left ventricular hypertrophy as a severe impairment or otherwise account for the theoretically possible severe complications listed in the internet article, his argument fails. ALJs are *not* required to account for all theoretically possible complications of a claimant's impairment. Rather, an ALJ is required to determine whether a claimant's impairment is severe based on whether the evidence, including objective medical evidence, shows that the impairment limits *the claimant's* ability to do basic work activities. *McDaniel v. Bowen*, 800 F.2d 1026, 1031 (11th Cir. 1986). "A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [the claimant's] statement of symptoms" or an internet article. 20 C.F.R. § 404.1508.

Moreover, an ALJ will "assess [the claimaint's] residual functional capacity based on

all the relevant evidence *in [the claimant's] case record*."  20 C.F.R. § 404.1545 (emphasis added).  Engram points to no evidence in this record – and there is none– that he suffers from any of the drastic complications listed in the internet article.  He cites no evidence that he suffers from any symptoms of left ventricular hypertrophy that were not considered by the ALJ in determining his residual functional capacity.

Thus, in determining Engram's residual functional capacity, the ALJ properly considered Engram's condition as a whole, based on the all relevant evidence in the case record.  20 C.F.R. § 404.1545.  The ALJ did not err by failing to account for merely theoretical symptoms listed in an internet article, and the ALJ could not have committed reversible error by failing to list Engram's left ventricular hypertrophy as a severe impairment.  *Cf. Burgin v. Comm'r of Social Sec.*, 420 Fed. Appx. 901, 903 (11th Cir. 2011) (panel decision) ("Even assuming the ALJ erred when he concluded [the claimant's] edema, sleep apnea, and obesity were not severe impairments, that error was harmless because the ALJ considered all of his impairments in combination at later steps in the evaluation process.").

**7.    The ALJ did not err in considering the frequency and type of medications that Engram took to treat his alleged pain symptoms.**

The ALJ articulated a number of reasons for her finding that the record did not support Engram's allegations regarding the severity of his pain.  Among those reasons was the following:

At the hearing, the claimant testified his average pain level is an 8 or 9 of 10.

> He reported his most severe pain reaches a 10 of 10 and his pain does not fall below a 5 of 10, even with medication. In contrast, the claimant also testified he only uses his pain medication 2-3 times a month when his pain is most severe, which is inconsistent with an average pain level of 8 or 9.

(R. 17).

Engram argues that the ALJ erred in considering the frequency with which he took narcotic pain medication (which, Engram argues, was *not* prescribed by his doctor). According to Engram, a claimaint's "pain threshold and treatment of the same are not a basis for finding that he did not suffer pain." (Doc. 13 p. 6). On the contrary, however, in evaluating the intensity and extent to which pain and other symptoms affect a claimant's ability to do basic work activities, the ALJ is entitled to consider a number of factors, including "[t]he type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate . . . pain or other symptoms" and "[a]ny measures [the claimant] use[s] or ha[s] used to relieve . . . pain or other symptoms." 20 C.F.R. § 404.1529(c)(3). As a matter of law, in evaluating the credibility of Engram's subjective testimony about the limiting effects of this pain, the ALJ did not err in considering the type and frequency of medication taken to alleviate that pain. *Id.*

## V. Conclusion

Accordingly, it is the **RECOMMENDATION** of the Magistrate Judge that the decision of the Commissioner be **AFFIRMED** and that this case be **DISMISSED with prejudice**.

It is further

**ORDERED** that the parties are **DIRECTED** to file any objections to the Recommendation on or before August 5, 2013. Any objections filed must clearly identify the findings in the Magistrate Judge's Recommendation to which a party objects. Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation objected to.  Frivolous, conclusive or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a de novo determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); *see Stein v. Reynolds Secs., Inc.*, 667 F.2d 33 (11th Cir. 1982); *see also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc) (adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981).

Done this 22nd day of July, 2013.


        /s/Charles S. Coody
CHARLES S. COODY
UNITED STATES MAGISTRATE JUDGE